## Case No. 3,845.

### DEVOE et al. v. PENROSE FERRY BRIDGE CO.

[3 Am. Law Reg. (O. S.) 79; 5 Pa. Law J. Rep. 313.]

Circuit Court, E. D. Pennsylvania. 1854.

INTERSTATE COMMERCE—ENJOINING ERECTION OF BRIDGES — JURISDICTION OF FEDERAL COURTS—PROCEDURE.

1. A court of the United States has the power to prevent, by injunction, the present or future erection of any bridge under the authority of one of the states, that by its construction will interfere with the navigation of a public stream upon which there is a commerce to any considerable extent with other states, though such stream lies wholly within the limits of the state. The

question in such case is relative, whether the bridge be or be not a greater obstruction to commerce than benefit to the public.

[Cited in Milnor v. New Jersey R. Co., Case No. 9,620; Silliman v. Hudson River Bridge Co., Id. 12,852.]

2. In such case, unless irreparable damage would be done to the defendants thereby, and though an answer be put in denying both the fact and the law, an interlocutory injunction may be granted upon affidavits, at once, until further order; and an issue may be then directed to determine whether the bridge under its present form, &c., is a nuisance to the navigation of the river, and, if so, whether any bridge can be constructed at the particular spot which will not be a nuisance.

[Cited in Gilman v. Philadelphia, 3 Wall. (70 U. S.) 741.]

This was an application to Mr. Justice GRIER, for interlocutory injunctions in three cases, involving the same state of facts.

GRIER, Circuit Justice. Three several bills have been filed against the Penrose Ferry Bridge Company, praying for injunctions to restrain them from erecting a bridge over the river Schuylkill. A motion for a special injunction has been made on the notice usual in each case. As they all involve the same questions with immaterial differences, we shall treat them as one case.

The complainants are citizens of other states, and owners, some of wharf property on the Schuylkill, others of coasting vessels, barges and canal boats trading from this port, on that river, to ports in other states. The bills set forth that the river Schuylkill, from its mouth to and beyond the port of Philadelphia, is, and for a long time hath been, an ancient, navigable, public river and common highway, free to be used and navigated by all citizens of the United States. That the river has a good tide-water navigation for over six miles above its mouth to the port of Philadelphia, for ships and vessels drawing 18 or 20 feet. That many of said ships, steamboats, barges, &c., navigating said river, are duly enrolled and licensed at the port of Philadelphia, a port of entry within the district of Philadelphia, under and by virtue of the act of congress in that behalf made and provided. That foreign vessels have been accustomed to navigate, and are entitled to navigate, the said Schuylkill with cargoes, bound to the port of Philadelphia, and to discharge the same, &c. That about a mile above the mouth of said river, the channel has been crossed heretofore by means of a ferry skiff or scow, which afforded ample convenience for the travel across the river without obstructing the navigation. That the Penrose Ferry Bridge Company, a corporation created and established by authority of the state of Pennsylvania, and the other defendants, citizens of Pennsylvania, have collected materials, and are engaged in constructing and erecting a truss toll bridge over and across the channel of said river at the site of the ferry.

That it is their intention to erect the bridge at an elevation of only six feet above the level of ordinary high water, and not over one or two feet above the level of the usual freshets in the river. The complainants charge that the erection of such a bridge as that threatened by defendants will greatly obstruct the navigation of the river, and will tend greatly to destroy the trade, commerce and business of the citizens of the United States, to their great damage and common nuisance; that many millions of dollars have been expended by citizens of the United States in the construction of works of public improvement terminating at said port on the Schuylkill, which will be much injured by such obstruction to the navigation of the river; that the defendants claim a right to erect said bridge under color of certain acts of the legislature of Pennsylvania, passed on the 9th of April, 1853 [Pa. Laws, p. 713], and 15th of April, 1854 [Id. 367], and pretend that certain draws placed in said bridge will afford sufficient passage-way for vessels navigating the river; but the complainants charge that the river Schuylkill having a good tide-water navigation to a part of the port of Philadelphia, the citizens of the United States are lawfully entitled to its full and free navigation without hindrance or obstruction by virtue of any state authority; and they aver that the proposed draws are utterly inadequate to meet the requirements of the present commerce and navigation of the river; and that no draw in any bridge to be erected there of suitable height, affording less than one hundred feet clear channel, would afford a sufficient passage to vessels and barges in the manner they are now accustomed to use and navigate the river. The complainants also severally aver that they will each suffer special damage to their business or property, if the erection of said bridge be proceeded with in the plan proposed.

A very large number of witnesses have been examined in the support and denial of the charges of these bills. The usual practice of this court on motions for special injunctions has been, to grant them as a matter of course, where no opposition is made by the defendants, on affidavits supporting the charges of the bill. And in patent cases, if the defendant denies, under oath the equity of the bill, the court will usually inquire no further, and will not proceed, on a mere preliminary motion and affidavit to try the whole merits of the case. But in applications for an injunction, in case of alleged nuisance, the practice has been somewhat different. In such cases, it is not sufficient to deny the law, or the facts relied on in the bill, to have the injunction refused, and the inquiry will be, whether it is not best for all parties that the erection of the supposed nuisance should be arrested till these questions be finally and properly decided. And if no irreparable or very material injury will probably arise to

the defendant, the court will issue the injunction without attempts to adjudicate the merits by anticipation. It is usually better for all parties that an injunction issue even in a doubtful case, till the merits of the controversy are finally decided. It has been my desire to pursue this course in the present case, and to have silently granted the injunctions, without forming or expressing any opinion on the merits, or the great questions of law and fact involved in the case. But, as the counsel have argued the case very fully on its merits, and as I find that illegitimate inferences have been drawn, and unnecessary fears excited, as to the results and consequences of certain doctrines supposed to be held by the court on this subject. I have concluded to briefly express an opinion on the leading questions of law and fact in the case, notwithstanding it may appear to be an anticipation of the final hearing of the merits. As the defendants in this case claim to act under the authority of the state of Pennsylvania in the erection of this bridge, which it is charged will be a nuisance to the navigation of the river Schuylkill, the right or propriety of the interference of this court becomes a matter of grave and serious consideration. The river Schuylkill is wholly within the territory of the state. She has exercised jurisdiction over its waters both as a state and a colony. She has authorized the erection of a dam and three bridges below the ebb and flow of the tide. States have an undoubted right to regulate all matters of police, including internal commerce, roads, ferries, canals and bridges. But the power conferred on the general government by the constitution of the union, to regulate commerce between the several states and foreign countries. necessarily authorizes it to keep open and free all navigable streams connecting the ocean with ports of delivery or entry, and protect the intercourse between the several states on all our tide-waters. When the exercise of their several powers come into conflict. those of the state must necessarily yield to the superior or controlling power. The jurisdiction of this court in cases like the present has been fully considered and decided by the supreme court in the case of Pennsylvania v. Wheeling Bridge. 13 How. [54 U. S.] 519. This court is not at liberty, even if so disposed, to disregard the authority of that case, and the people of Pennsylvania, at whose instance the doctrines contained in it were established, are morally estopped from questioning their correctness. It is there decided that, although the courts of the United States cannot punish by indictment the erection of a nuisance on our public rivers, erected by authority of a state, yet that as courts of chancery they may interfere at the instance of an individual or corporation. who are likely to suffer some special injury, and prohibit by injunction the erection of nuisances to the navigation of the great navigable rivers leading to ports of entry within a state. The commerce on the river Schuylkill below the port of Philadelphia, is as much entitled to this protection as that of Ohio, Mississippi, Delaware or Hudson; and the complainants in this case have shown the same right to the interference of this court in their behalf, as was shown by the state of Pennsylvania in that. In fact, every question of law which has been agitated in the argument, either in these cases, or the one which preceded them, has been fully considered and decided by the supreme court in that case. and it is unnecessary for this court to vindicate their decision by further argument.

Let us now proceed to examine the facts in evidence on the present motion, and how far they will justify the interference of this court by injunction. At common law, every obstruction, however small. to the free navigation of a public river, might, in strictness, be styled a nuisance. But the stringent application of this definition to every bridge over every creek where the tide ebbs and flows, or which a chance sloop might occasionally visit, would be absurd and highly injurious to public interests. Intercourse by means of turnpikes. canals, railroads and bridges. is a public necessity. A railroad constructed by the authority of a state. is often many thousand times more beneficial to the interests of commerce than the unlimited freedom of navigation over unimportant inlets, creeks or bays, or remote portions of a harbor. It would be unreasonable to insist that the millions who travel on them, should be subjected to great delay or annoyance for the convenience of a few sloops or fishing smacks. Where bridges are constructed with draws, or openings for the passage of masted vessels, and high enough to permit others to pass under if possible. the occasional delay of such vessels for a short time may be a trifling inconvenience, in comparison with the public benefit of the bridge. In every investigation of this kind the question is relative, not absolute. Whether a certain erection be a nuisance must depend upon the peculiar circumstances of each case,—when the trade of the channel is of great amount and importance and that across it trifling. the same rule cannot apply, as to a case where the conditions are contrary. If a steam ferry can amply accommodate those who cross the stream, and a bridge with a draw would inflict an injury on commerce, and tax the public by increased freight, there is no sufficient reason why a bridge should be erected because it will be more profitable stock than a steamboat or towboat, or better accommodate some small neighborhood or neck of land. The city of Boston is situated on a peninsula. No public necessity could well exist which would justify a bridge, compelling all the commerce of her port to pass through a draw; while it might be very reasonable that vessels passing from one part of the port or harbor to another, should be compelled to submit to some incon-

venience for the sake of a bridge erected for one of the great railroads, so important to the prosperity and wealth of the city. It would be an abuse of the term to call the Schuylkill dam a nuisance, because it is below tidewater, and converts a few miles of useless sloop navigation into a canal which annually adds millions to the wealth of the city and state, and whose commerce constitutes the staple of this western portion of the port of Philadelphia. Nor is it any appreciable injury to the commerce of the port that vessels with high masts cannot pass the Market street bridge. Ample space for those vessels still remains at the wharves below. The great staple of this western port is coal, and this bridge is built of such a height as not to interfere with the passage of the steam tugs and canal boats engaged in transporting it. The city of Philadelphia now extends across the Schuylkill, and such a bridge is a public necessity. The same may possibly be said of the Gray's Ferry bridge, over which the railroad to Baltimore passes. Vessels with masts and steamboats with high chimneys are, no doubt, put to considerable inconvenience in passing the draw; but the bridge is built so high that the immense trade in coal can pass under it without interruption. Besides, when this bridge was first erected, the commerce of the river was of little importance compared to its present condition, and the mode of transporting the coal has accommodated itself to the state of the navigation and its impediments, as they then existed. If the erection of such a bridge at that place were now proposed for the first time, its propriety might have admitted of some doubt.

With a view to these principles, let us now examine the structure proposed to be erected by the defendant. 1st. The bridge is to be some five or six miles below the port of Philadelphia, although within the present city limits, and about one mile above the mouth of the Schuylkill river. 2nd. The defendants propose to erect it at a height of six or eight feet above high water level, and two feet above the usual freshets of the river. 3rd. It is to have a pivot draw on a pier in the centre of the river channel, which, when open, will leave a passage on each side of the pier of about 60 feet in the clear. 4th. Sailing vessels and single steamboats without tows, may pass with some delay and inconvenience, but sufficient to cause an increase on freight of from three to five cents a ton. 5th. A large portion of the great commerce of this river is coal, conveyed to the port by the Schuylkill canal, which coal boats are at present towed by small tugs below the Gray's Ferry bridge, under which they can pass without delay or inconvenience. The canal boats containing the coal are then received by steamboats of a larger class, which take them in tow, necessarily ranged four abreast. These would neither pass under the bridge nor through the draws of the proposed bridge, without great danger, difficulty and delay.

6th. The erection of this bridge will necessarily cause an entire change in the transportation of coal on the river below the port. Wharves will have to be constructed below it, and the larger steamboats remain there; thereby greatly increasing the expense of towage by the small boats above. 7th. It will operate as a tax upon coal, of five cents per ton, by increasing its freight to that amount. This item alone amounts to $20,000 per annum. 8th. The city of Philadelphia, through her select and common councils, has remonstrated firmly against any legislative license for the erection of a bridge at this place, and declares that, by "this dangerous obstruction, trade amounting to more than a million of tons annually, would be seriously impaired, and driven from that portion of the port; and that the large investments of the city in her gas-works, and other property on the Schuylkill, and a large proportion of all the wharf front, would be greatly injured by any farther bridge below Gray's Ferry." 9th. It is in evidence, also, that the city is now at a great expense in removing the gas-works below the bridges; and among the reasons for such a measure, was their expectation of having the bituminous coal imported from Liverpool in large vessels, delivered to them free from the obstruction of bridges; and that the erection of this bridge will cause an additional cost to the city in this matter, of fifty cents a ton on all the coal imported for her gas works. 10th. There is no public necessity for the erection of such a bridge over the mouth of the Schuylkill, nor any benefits which will at all counterbalance the evils to commerce which will be caused by it. 11th. The farmers of Tinicum and part of Kingsessing, to whom it might be a convenience (especially in winter) to have a bridge at this place, can cross with their market wagons with as much safety and as little delay by steamboat ferry as a bridge. If the quantity of travel is not sufficient to support a steam ferry, it is conclusive evidence that there is no public necessity for an erection of a bridge which will tax commerce to such an extent.

Upon the whole, I think it is abundantly in evidence, from the testimony before me, that the proposed bridge, if erected, will greatly injure the commerce passing from and to other states, along the river Schuylkill, to the port of Philadelphia; and also that there is no public necessity for a bridge at that place which can justify the sacrifice of other and superior interests to so great an extent. I concur with the city council "that any obstruction at or near the outlet of such a great public highway, must seriously interfere with the growth of that trade, and only tend to sacrifice great public interests to partial and individual benefit." See Journals of Councils, vol. 18, p. 157. Such an erection will, therefore, be a public nuisance to the navigation of the Schuylkill river and the commercial intercourse of other states with the port

of Philadelphia, and ought to be restrained. Let the injunction issue till further order.

If the defendants desire to pursue this matter any farther, the court will order an issue to try at next term the following questions: 1st. Whether a bridge, erected as now proposed at the place called "Penrose's Ferry," would be a nuisance to the navigation of Schuylkill river, or not. 2nd. Whether any bridge can be built at that place which will not materially affect the public interest and commerce of the river; and, if so, of what height, breadth of draw, &c.

NOTE. It may be proper to state that the preceding case, though it involves the same principles, is not that which gave rise to some remarks in a previous number of this journal; and that the bills upon which it is founded were not in fact known to be in contemplation at the time those remarks were printed. The present bills, indeed, are filed by different parties, and under somewhat different circumstances. We must beg also leave to disclaim, with regard to the article to which we refer, the least intention of applying its observations to the learned and able court in which these cases arose. For that court none can have greater respect, or can rest with more confidence on its decisions, than ourselves. Our object was only to deprecate, with earnestness, it is true, but still with great deference, conclusions towards which the federal courts, in general, appeared to be drifting. The particular case entered very little into the considerations which actuated us; it was only the occasion, not the subject of our remarks; and it may well be that the bridge whose erection has just been restrained, is both hurtful and useless. When the power now claimed is exercised by a judge whose strong good sense and thorough learning are so well known, we might be sure that it would be exerted only in the way most beneficial to the public. But we cannot hope that it will always and in all places be confided to such competent hands; and that prudence and moderation will invariably accompany its exercise. It involves, indeed, what is substantially an act of legislative discretion, and is enforced by the summary and abrupt process of an immediate injunction. And setting aside all constitutional considerations, there are few men to whose uncontrolled judgment we would like to trust such a power, especially in the important matters of commerce. This, however, like unfortunately too many other innovations, presented itself with its fairest and most promising side foremost; and some were perhaps inclined to forget, since the doctrine sought to be established would work conveniently in the present, that the precedent might not be looked upon with so much pleasure in the future. Willing, therefore, as we might otherwise be to acquiesce in the wisdom and propriety of this particular decision, it was only the more the duty of those who were convinced of the dangers which were hidden underneath these doctrines, to protest respectfully against their extension.